UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:17 CR 526 RLW / DDN |
| ) | |
| KURT WALLACE, ) | |
| ) | |
| Defendant. ) | |

## ORDER AND RECOMMENDATION

This action is before the Court on the pretrial motions of the parties that were referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b). Pending are the motions of defendant Kurt Wallace (1) for a pretrial determination of the admissibility of co-conspirator statements (Doc. 302);[1] (2) to exclude forensic evidence (Doc. 303)[2]; (3) to suppress cellular location data (Doc. 305); (4) to suppress photo lineup identifications (Doc. 306); (5) to suppress statements (Doc. 307)[3]; and (6) generally to suppress arguably suppressible evidence (Doc. 207 oral); and of the government for a determination of the admissibility or not of any arguably suppressible evidence (Doc. 208 oral).

---

[1] See footnote 2, below.

[2] The motions for a pretrial determination of the admissibility of co-conspirators' statements and to exclude forensic evidence are in the nature of the pretrial motions *in limine* which the undersigned defers to the District Judge for pretrial rulings.

[3] At the beginning of the suppression hearing, counsel for the government stated that the government would not use in its case-in-chief at trial the statements defendant Wallace made on August 22, 2017. However, the government will use the videotaped statement Wallace made in the hospital after he escaped from custody and was recaptured. (Doc. 355 at 3-5.)

Defendant Wallace is currently [4] charged in the second superseding indictment with being a felon in possession of one or more firearms between August 1, 2016 and November 17, 2017 (Count 1); ); armed carjacking on September 16, 2017 (Counts 4 and 5); armed carjacking on October 15, 2017 (Counts 8 and 9); carjacking on October 16, 2017 (Count 10); murder on October 16, 2017 (Count 11); escape from custody on July 15, 2019 (Count 13); and carjacking on July 15, 2019 (Count 14).

An evidentiary hearing was held and a transcript of the hearing has been filed. The parties have filed relevant memoranda. The motions are ripe for decision.

## I.
### *Motion to suppress photo lineup identification (Doc. 306)*

Upon consideration of the evidence adduced during the hearing and considering the arguments of the parties on the defendant's motion to suppress a photo lineup, the undersigned makes the following findings of fact and conclusions of law:

### **FACTS**

1. During October 2017, St. Louis Metropolitan Police Detective Katherine Rund[5] became the lead detective in the investigation of the September 16, 2017 shooting of victim Marlin Hudson that occurred during a carjacking.

2. When interviewed by the police on the day he was shot, victim Hudson described the shooter as a black male, wearing black pants, a black hooded sweatshirt with the hood pulled up, and a white shirt tied around the bottom of his face. He also described

---

[4] On June 13, 2022, on motion of the government, Counts 2, 3, 6, 7, and 12 were dismissed without prejudice. (Doc. 326.)

[5] At the time of the suppression hearing Det. Rund was very experienced. She had been a St. Louis City Police Officer for 17 years. Of that period she had been a homicide detective for seven years.

the shooter as 24 or 25 years of age, weighing about 140 pounds, and standing about 5 feet 9 inches tall.

  3. A couple of days before October 25, 2017, Det. Rund phoned victim Hudson for an interview.  She was also investigating another matter and wanted to see if his information might be relevant also to that investigation.  He told her that that day was not a good time for an interview and that the detective should contact him at a later time.

  4. a. After contacting him again by phone, Det. Rund interviewed victim Hudson on October 25, 2017, for about 30 minutes in her police car outside the home of a friend of his.  In the October 25 interview, Mr. Hudson told Det. Rund the following.

   b. Hudson had driven to the carjacking location about 7:30 a.m., after it had become daylight.  At that time and place Jherrica Dixon got into his car and they conversed.  Shortly thereafter, another person approached and tapped on Hudson's driver's side window with a long gun, which Hudson said he thought was an AK-47 rifle.  While Hudson considered driving away quickly, the subject looked at him in a way that frightened him and he just wanted to get out of the car quickly.  Hudson got out of the car and was told by the person with the rifle to get his belongings.  When he said he did not have any, the person shot him in the right shoulder.  Hudson then ran away.

   c. Hudson told Det. Rund that the lower portion of the shooter's face was covered.  The detective asked Hudson if he thought he could identify the shooter. Hudson said yes, because they were so close to each other and it was daylight.  Hudson also told Det. Rund that the shooter had looked at him directly in the eyes while he was still in the car and then again after he got out of the car before being shot.

   d. Hudson described the shooter as a black male, wearing a puffy hood that was pulled up, which caused Hudson to speculate that the shooter wore dreadlocks. Hudson stated the shooter wore a white tank top shirt tied around the bottom of his face. Hudson said the shooter stood 5 feet 7 or 8 inches tall.

  5. From this information, Det. Rund listed the shooter's characteristics as a black male, with dreadlock hair, 24 years of age, weighing approximately 155 pounds, and

standing about 5 feet 7 inches tall.  From her investigation, Det. Rund developed defendant Kurt Wallace, whom she had never known before, as a potential suspect.

6. For use as a component of a photo array, Det. Rund obtained a photograph of Wallace from the Missouri Department of Revenue, because it would be the most recent photo available; this photo had a blue background.  In order to compile an unbiased and fair photo array, Det. Rund asked other homicide detectives for photos with blue backgrounds.  Ultimately 500 or more photos with blue backgrounds were obtained and reviewed to find 5 photos for the array.

7. Det. Rund selected 5 photos to accompany the photo of Wallace in an array that had the following characteristics:  black male subjects in their mid-20s who were wearing dreadlocks approximately shoulder length and who were displayed against blue backgrounds.  Det. Rund placed Wallace's photo in position 5. [6]  Det. Rund numbered each photo in the array 1 through 6, by handwriting the numbers in the upper left corners.  *See* Gov. Exs. 2A through 2F.

8. To the perception of the undersigned, each of the six photos depicted a black male with reasonably similar black hair that extended to the shoulders.  All six subjects had dark facial complexions and brown eyes.  All appeared to be of approximately the same age.  None wore eyeglasses.  All were depicted against blue backgrounds.  Subjects 1, 4, and 5 wore black shirts; subjects 2 and 6 wore white shirts; and subject 3 wore a grey shirt.  No unusual characteristic(s) distinguished subject 5 from the other five. [7]

9. Det. Rund planned to present the six photos in a stack to victim Hudson, one photo at a time.  This way the witness would view each photo isolated from the other

---

[6] Det. Rund's practice was to never place a suspect's photo in the first position.  She always encouraged witnesses to look at each and every photo in the arrays carefully before making or not making an identification.

[7] In her law enforcement career, Det. Rund had been involved in 50 to 100 photo lineups and arrays.

4

photos, until the witness moved to the next photo.  Other than Det. Rund's handwritten numbers, there was no identification of any subject on the displayed photos.

10.  On October 30, 2017, at approximately 7:00 p.m., Det. Rund and two police detectives who were not familiar with the investigation or the subject in photo #5 ("blind lineup administrators") [8] drove into an apartment complex parking lot.  The two "blind lineup administrator" detectives got out and met with victim Hudson at the trunk of the police car.  Det. Rund remained in the car.  Hudson was not accompanied by anyone.

11.  At the rear of the police vehicle, Det. Tully orally instructed victim Hudson, "The person responsible for this incident may or may not be in the photographs I am about to show you."  He told Hudson the photos would be shown individually and he should look at each of them carefully and, if he recognized someone, he should state whom he recognized and why.  Det. Tully told Hudson it was all right if he did not recognize anyone. He told Hudson, "Just let us know after you review each photo."  Neither detective threatened Hudson in any way or made any promise to him.  The photos were handed to Hudson one at a time.  Hudson identified No. 5 as the person who robbed and shot him. Det. Tully told him to also look at No. 6.  Hudson did so.  Marlin Hudson initialed and dated No. 5 as the photo of his assailant.  After Hudson initialed and dated No. 5, Det. Rund got out of the police car and spoke with Hudson about photo No. 5.

12.  Next, Det. Rund and Hudson completed the identification acknowledgement form that was captioned, "PHOTOGRAPHIC LINEUP ACKNOWLEDGEMENT METROPOLITAN POLICE DEPARTMENT – CITY OF ST. LOUIS."  Det. Rund filled in a portion of the form by handwriting "Marlin Hudson," "10/30/17," the police report number, the name of one of the blind administrators, the time, again the date, and the name of the other blind administrator as a witness to the identification.  Victim Hudson

---

[8] The "blind lineup administrators" were Det. Thomas Kranz and his partner, Det. Colin Tully.  Det. Tully testified at the suppression hearing, and the undersigned finds, that he had been a police officer for 17 years.  In his career he had compiled about 50 photo arrays and he had administered about the same number.  He had not been assigned to the Hudson carjacking investigation.  He had never met Hudson or defendant Kurt Wallace.  Det. Rund did not tell either of the two detectives which photo was her suspect's.

handwrote his first name. Hudson put an X in the box next to the preprinted statement that he identified photo number 5 as the person he recognized from the "robbery / shooting." He checked the box next to "I am certain that I have made a correct identification of the suspect." He then printed his name, signed his signature, and wrote his address. Gov. Ex. 2G. Hudson was very certain of his identification.

## **DISCUSSION**

Defendant argues that the photo array shown to victim Marlin Hudson was impermissibly suggestive. Under the Due Process Clause, identification evidence must be suppressed if it results from a procedure that is impermissibly suggestive and that may lead to an irreparably mistaken identification. *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967). Such an identification, however, may be admissible if it is nonetheless reliable. *Neil v. Biggers*, 409 U.S. 188, 198-99 (1972). Reliability depends upon (1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's description of the suspect prior to the identification; (4) the witness's level of certainty at the time of the identification; and (5) the length of time between the crime and the identification. *Manson v. Brathwaite*, 432 U.S. 98, 114-16 (1977).

Specifically, defendant argues that the photos shown to victim Hudson were impermissibly suggestive of No. 5, because (a) the photo of defendant, No. 5, was zoomed in closer to him than those of the other subjects; (b) the blue background of No. 5 stood out as a "richer" blue color than the other photographs; and (c) defendant's hair was longer than the others. Defendant's arguments are factually incorrect.

Regarding objection (a), all the faces in the array are approximately the same size, with perhaps 5 and 6 being a little smaller than the others, and the others being a little larger. Regarding objection (b), the blue background of No. 1 is nearly identical to that of defendant's No. 5, with the others being varying shades lighter. Regarding objection (c), defendant's hair in No. 5 cannot be said to be longer than the hair in Nos. 1 or 2.

6

Nothing in the six images causes any of them, let alone No. 5, to be substantially distinguishable from all the others. The undersigned concludes that the photos selected to accompany defendant's did not render the display impermissibly suggestive. This conclusion is bolstered by the expressed intention and efforts of Det. Rund to compile a group of photos of subjects without substantially distinguishable characteristics. She also employed the "blind lineup administrator" procedure to assure her involvement in the investigation did not influence how the photos were presented. And the instructions given to victim Hudson relieved him of any feeling he needed to identify someone just to justify the identification effort. The procedure used was not impermissibly suggestive.

Further, Marlin Hudson's identification of defendant as the shooter was constitutionally reliable. His opportunity to view his assailant was substantial if quick, both from inside his vehicle and outside. His attention to the face of the assailant was very focused, again, both while he was inside his vehicle and then after he got out. Hudson's descriptions of the assailant on September 16 and later on October 25 were consistent. Nothing in the record indicates that the period between the crime on September 16 and the photo identification on October 25 was sufficiently long to diminish Hudson's recollection of the event. His identification of photo No. 5 was very certain.

For these reasons, the motion to suppress the photo identification of defendant as the shooter by victim Marlin Hudson should be denied.

## II.

### *Motion to suppress cellular location data (Doc. 305)*

Defendant has moved to suppress the location evidence the government obtained from defendant's cell phone. Defendant argues the warrant that authorized this seizure was unconstitutionally overly broad and lacked particularity in describing the data that could be seized. Further, defendant argues that Det. Rund's affidavit for the warrant did not establish probable cause. (Doc. 305 at 2.)

From the record, the Court makes the following findings of fact and conclusions of law:

## FACTS

1.      On November 9, 2017, St. Louis City Police Det. Katherine Rund applied to the Circuit Court of the City of St. Louis for a warrant to obtain from Metro PCS's cellular account for phone number 314-XXX-7127 the following information:

> All information necessary to detail the various physical locations of the below described **Metro PCS cellular phone, between the times /dates of 12:00 A.M. on September 1st, 2017 to PRESENT.** Information is to include, but not be limited to, subscriber information; incoming /outgoing calls; text messages; all Historical Mobile Locate Data and / or PCMD that is associated with target phone number; call origination / termination locations, physical address of cell sites, and R.F. coverage maps for an area encompassing a 25 mile radius of the City of St. Louis, Missouri

*See* Gov. Ex. 3A.  The application stated this information was "[b]elieved to have been used as means for committing the felony of" . . . "Murder 1st Degree, Robbery 1st Degree and ACA." *Id.*

2.      Relevant portions of Det. Rund's probable cause affidavit are identified and described below.  *Id.*

3.      The Missouri Circuit Judge signed the search warrant on November 9, 2017, at 11:50 a.m.

## DISCUSSION

### *Defendant's standing*

Defendant argues that the Metro PCS search warrant for the precision location information for the subject phone number was unconstitutionally broad to satisfy the Fourth Amendment.  The government argues that defendant has not established that he has standing to complain about the legality of the warrant.  Defendant replies that his motion establishes his standing by stating these two sentences:

> (1)     "Mr. Wallace requests that pursuant to the Fourth Amendment of the United States Constitution this Honorable Court suppresses the cellular location data that was retrieved from his device pursuant to an invalid search warrant." (Doc. 305 at 1.)

8

> (2)   "The search warrant was ultimately approved and the detective was given unrestricted permission to search through Mr. Wallace's Metro PCS cellular phone between the times/dates of 12:00 A.M. on September 1, 2017 to present, this being November 9, 2017." (*Id.* at 2.)

These two sentences assert the conclusion that the cell phone was "his." Without expressly denying the cell phone belonged to defendant, the government argues that defendant must affirmatively show that he had an expectation of privacy in the subject information that is protectable under the Fourth Amendment. *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *Minnesota v. Carter,* 525 U.S. 83, 88, 90-91 (1998).

A constitutionally protectible expectation of privacy is comprised of two elements: (a) a subjective expectation of privacy in the subject matter of the search and (b) that this expectation of privacy is objectively reasonable. *United States v. Douglas*, 744 F.3d 1065, 1069 (8th Cir. 2014). Relevant factors to be applied were stated by the Eighth Circuit Court of Appeals in *United States v. Russell*:

> [O]wnership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

847 F.3d 616, 618 (8th Cir. 2017) (quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)). Standing may be shown by information that the defendant owned, used, or purchased the phone that was the subject of the warrant. *United States v. Baker*, 2012 WL 12527307, at *9 (E. D. Mo. Sept. 29, 2012).

The affidavit of Det. Rund, which was used to support her application for the subject warrant, supplies the needed standing for defendant's motion to suppress. The relevant portion of the affidavit states:

> Kurt Wallace is on probation and he gave his phone number as 314-XXX-7127. This was also the phone number that had been in contact with Jherrica Dixon. An inquiry of Kurt Wallace's telephone number revealed same to be associated with the carrier Metro PCS.

9

> Based on this affidavit, I am requesting permission to obtain records for the Metro PCS cellular phone account identified by telephone number 314-XXX-7127 belonging to Kurt Wallace.

*See* Gov. Ex. 3B at 4.)  These statements indicate the government's belief that defendant owned and used the phone.  Defendant's standing is thereby established.

*Probable cause for warrant*

Defendant argues in effect that the scope of the subject warrant exceeded the showing of probable cause in Det. Rund's affidavit.  The Court disagrees.

Defendant's argument invokes his rights under the Fourth Amendment to the Constitution.  The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.   The issue before this Court when reviewing the legal sufficiency of the basis for the issuance of the Circuit Court's warrant is whether the detective's affidavit provided "a substantial basis for [the issuing judge to] conclude[e] that probable cause existed" for the issuance of the warrant.  *E.g. United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016) (referencing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

A finding of probable cause "depends upon whether, under the totality of the circumstances, there is a fair probability evidence of a crime will be found in a particular place." *Faulkner*, 826 F.3d at 1144.  In defendant's case, the only information submitted to the issuing court was Det. Rund's affidavit.  Therefore, this reviewing Court is required to look only to the contents of this affidavit to determine whether the issuing judge's finding of probable cause is supported by substantial evidence. *United States v. Saddler,* 19 F.4th 1035, 1039 (8th Cir. 2021) ("only that information which is found within the four

corners of the affidavit may be considered in determining the existence of probable cause.").

The detective's affidavit described the purpose of the warrant, *i.e.,* to determine defendant's physical location during the events being investigated and to determine whom he may have been in contact with. *See* Gov. Ex. 3A at 5.

After reviewing the application and affidavit, the Court is satisfied that the following rendition by the government of the relevant contents of Det. Rund's application and affidavit is correct:

> A crime committed on September 9, 2017 (armed carjacking) and the recovery of the stolen vehicle two days later that was occupied by Defendant (Exh. 3A p. 2). Following the vehicle's recovery, one of the carjacking victims positively identified Defendant as being involved (Id.).
>
> A crime committed on September 16, 2017 (armed carjacking and shooting of M.H.) with the carjacking and shooting victim M.H. positively identifying Defendant and Jherrica Dixon as being involved (Id. p. 3).
>
> A crime committed on October 15, 2017 (armed carjacking and shooting) with the carjacking victim J.O. positively identifying Dixon as the person he communicated with who requested he travel to the area, and police recovering .45 caliber cartridge casings at the scene and, later, J.O.'s stolen vehicle with the rear-view mirror missing (Id. pp. 3-4 ).
>
> A crime committed on October 16, 2017 (armed carjacking and murder of J.G.) with police recovering .45 caliber cartridge casings at the scene and, later, the stolen vehicle with the rear-view mirror missing (Id. pp. 4-5 ).
>
> Review of phone records determined that three of the five victims had been in contact with Dixon immediately prior to the crimes (Id. p. 5).
>
> Review of phone records determined that Dixon had been in contact with Phone 7127 during the time period when these four crimes were committed (Id.).
>
> Phone 7127 was provided by Defendant to communicate with his state probation officer (Id.).
>
> Phone 7127 was serviced by Metro PCS (Id.).

11

(Doc. 341 at 21-22.)  With this information, Det. Rund's affidavit provided a substantial basis for the issuing judge to determine that probable cause existed for data regarding defendant's locations and the people with whom he was in phone contact with, all relevant to the detective's investigation, would be found in the data sought from Metro PCS account for defendant's telephone number.

The motion to suppress the cellular location data should be denied.

## III.

### *Motion to suppress statements (Doc. 307)* [9]

Defendant seeks to suppress only the statements he made during a confined interview on July 16, 2019, after he escaped from federal custody and was recaptured. Defendant argues that, even though his *Miranda* rights were given to him, he did not knowingly and voluntarily waive them.

From the record, including the videorecord of the July 16 interview, Gov. Ex. 4, the undersigned makes the following findings of fact and conclusions of law.

## **FACTS**

1. Defendant Kurt Wallace was interviewed in a well-lit windowless interview room approximately 10 by 20 feet in dimension.  The room contained a medium size square table, which was situated in a corner of the room, and two facing chairs, which were not separated by the table, one chair with arms and the other without arms.  A broken clock hung on one wall.  Wallace was brought into the room at 2:22 minutes into the recording

---

[9] At the beginning of the suppression hearing, counsel for the government stated that the government would not use in its case-in-chief at trial the statements defendant Wallace made on August 22, 2017.  However, the government stated it will use at trial the videorecorded statements Wallace made in police custody after he escaped from custody and was recaptured.  (Doc. 355 at 3-5.)  This videorecorded interview was received into evidence during the hearing as Government Exhibit 4 and has been carefully reviewed in audio form by the undersigned.  This recording is 45 minutes in length.

and left there alone.[10]  Wallace was seated, with his hands cuffed and his ankles shackled, in the armless chair which faced the other chair approximately 5 feet apart.

2. At 4:47 minutes into the recording, Sheriff's Office Det. Pat Hearn (phonetically spelled) entered the room and addressed defendant, "Mr. Wallace, how are you?"  Wallace looked up at him and said twice, "Sore, I'm all right."  The detective said, "Uh huh."  Wallace quickly repeated, "Sore I'm all right." [11]  The detective acknowledged this with "Sore?"  Wallace stated, "Yeah."  The detective acknowledged this stating, "Yeah."  The detective then introduced himself, "All right, well, my name is Pat Hearn, I'm a detective for the Sheriff's office."  The detective then said, "I'd like for you and I to talk."  Wallace stated, "Yeah."  The detective continued, "In order to do that I'm going to protect you and to protect me."  Next, the detective asked him for his birthdate, adding "please," and the last four numbers in his social security number.  Wallace spoke the answers quickly and coherently.  Next, at approximately 5:35 minutes Det. Hearn stated, "So, this is your advice of rights.  Before we ask you any questions you must understand your rights."  Then, from a preprinted sheet Det. Hearn orally and clearly read to Wallace his constitutional rights to remain silent and to counsel, by reading them from a preprinted sheet.  When he finished, the detective asked him whether he understood these rights.  At 5:55 minutes, Wallace clearly and distinctly said, "Yeah."  Wallace did understand his *Miranda* rights.

3. At 5:59 minutes, Det. Hearn asked defendant, "How sore are you?"  Wallace responded, "I'm all right."  When Wallace said this, his physical demeanor did not indicate any discomfort or pain.  Immediately next Wallace asked, "What are these, federal

---

[10] Because the hands on the wall clock did not move at all during the interview, the undersigned uses the recording time in minutes to place the events that occurred in the interview room.

[11] Defendant Wallace proffers in his motion to suppress these statements that this interview occurred the day after defendant's being injured in a vehicle accident in which Wallace's vehicle had "flipped over a median and landed upside down resulting in injury to both his arm and leg." (Doc. 307 at 7.)  The government does not contest this description of the vehicle accident.

charges? State charges?" Det. Hearn responded, "There may not be any charges yet.  I don't know.  But, if it was federal, it wouldn't be me, because I'm the detective for the Sheriff's Office.  All right?"

4. Next, at 6:18 minutes, the detective asked him about his soreness.  Wallace said his arm was sore and his leg "a little bit."  The detective asked whether that was from his fall during the escape or from the car rolling over.  Wallace stated it was from the car rolling over.  The detective asked, "You're not hurt from the fall?"  He answered, "No."

5. At 6:50 minutes, the detective stated he wanted to ask him questions about the fall and what preceded it.   The detective said law enforcement had statements about the escape from others and that they wanted Wallace's version, because he was the person who jumped out.  At about 7:25 minutes, the detective asked about when people began working on the bar that was used to batter the way out of the jail.  Wallace clearly answered all the detective's questions about the escape from custody and the prisoners' preparations for the escape.  At approximately 9:20 minutes into the recording, Wallace described how other inmates wanted to escape and he admitted he went along with them because he wanted to go out also.  He was told by inmates that he needed to help by busting out a window.  Wallace made narrative statements with occasional interjections such as, "OK" by the detective.

6. At about 25:09 minutes, Det. Hearn asked, "What questions do you have for me?"  In response, Wallace asked the detective whether he had "the whole case there, like everything that was happening" referring to the detective's portfolio which was laying on the nearby table.  Det. Hearn said no, stating it was just a folder he just brought from his car with paper to write on.  At 25:25 minutes, Wallace asked whether the detective thought "they were going to charge [him] with a carjacking charge?"  The detective responded, "I don't know.  That's a different agency than me."  Wallace stated the carjacking was his main question and concern.  The detective replied, "I don't know an answer to that.  If I did, I'd tell you.  You've been honest with me and I appreciate it."  Without being asked any question, Wallace gave a narrative statement wondering where he would be confined and about the events preceding the interview.

14

7. At 27:05 minutes, Det. Hearn said he would be back in a minute and left the interview room. As he walked out, he asked Wallace if he needed anything. Wallace shook his head no. While the detective was away, Wallace sat in the chair quietly, but not sleeping. He moved around in the chair a little.

8. At 37:00 Det. Hearn returned to the interview room, sat down, and asked more questions about clothing and other topics. Again, Wallace answered questions at length.

9. During this entire interrogation, Wallace was coherent, frequently gesturing with his hands, even though cuffed. In answering questions, he frequently spoke longer than Det. Hearn took to ask the questions. Only on occasion did Wallace hesitate after hearing the question and before he answered. These periods of hesitation did not indicate incompetence, great fatigue, or great pain, but were periods in which Wallace appeared to consider his answers. Frequently, he answered questions quickly and always coherently and clearly. Wallace never appeared to be under the influence of medication or pain or barely able to stay awake.

10. Det. Hearn's questions focused on how the county jail was run, not only generally but also during Wallace's escape episode. There were questions about how in Wallace's mind the Jail could be made more secure. He was very forthcoming about such matters.

11. At the end of the interview, Det. Hearn asked Wallace whether, if the detective had more questions, would it be all right to bring him back over for another interview, to which Wallace answered in the affirmative. The detective said to him, "I appreciate your help." They shook hands and the detective left the room. The interview ended at 43:54 minutes. Wallace sat alone in the room until approximately 45:30 minutes when he was taken from the room.

## DISCUSSION

The government has the burden of establishing the constitutional admissibility of a defendant's statements by a preponderance of the evidence. *Colorado v. Connelly*, 479

15

U.S. 157, 169 (1986); *Lego v. Twomey*, 404 U.S. 477, 489 (1972).  The admissibility of a defendant's statements depends upon whether the statements are constitutionally voluntary, *Colorado v. Connelly*, 479 U.S. at 163-67; and, when the statements are made during police interrogation while the defendant was in custody, whether the defendant had been advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and, if so, whether the defendant knowingly and voluntarily waived his *Miranda* rights, *North Carolina v. Butler*, 441 U.S. 369, 373, 375-76 (1979).

### *Defendant received Miranda warnings*

Other than the first couple of biographical questions in the interview about defendant's date of birth and social security number, all of defendant's statements followed his being clearly advised of his *Miranda* rights by the detective reading them from a sheet.  Defendant said he understood his rights.  From the totality of the circumstances, the undersigned finds and concludes that defendant understood his *Miranda* warnings.

### *Defendant voluntarily waived his Miranda rights*

Defendant argues that he did not waive his *Miranda* rights because of his level of education, his lack of sleep and fatigue during the interview, and the amount of pain he was then suffering.

An express waiver of rights is not required for defendant's statements to be admissible; a constitutionally sufficient waiver can be implied from the relevant circumstances.  *North Carolina v. Butler*, 441 U.S. at 373; *Thai v. Mapes*, 412 F.3d 970, 977 (8th Cir. 2005). "A waiver is knowing and intelligent where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right, and a waiver is voluntary where the court can determine that the waiver was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or deception." *United States v. Annis*, 446 F.3d 852, 855 (8th Cir. 2006) (quoting *Thai v. Mapes*, 412 F.3d at 977) (internal quotation marks omitted).

In this case, defendant Wallace was interrogated by a detective who from the first time he entered the interview room treated defendant with concern and dignity. Det. Hearn greeted defendant and asked him how he was. Defendant told him he was sore which was acknowledged by the detective. The detective asked him about how sore he was. Defendant twice answered, "I'm all right." While defendant had recently been in a substantial vehicle accident involving the vehicle flipping over, defendant was not rendered unable to invoke his rights to remain silent or to counsel at any time during the interview.

Immediately before the *Miranda* rights were read, when the detective said, "I'd like for you and I to talk," Wallace stated, "Yeah." After the rights were read, defendant was anything but silent. He made lengthy answers and asked the detective questions. During the period that defendant was left alone in the interview room, he did not doze off. He appeared to remain alert. At no time did defendant indicate any interest in not answering questions. He never asked for the interview to stop. He never asked for an attorney.

Defendant argues the detective lied to him by stating "There may not be any charges yet." Contrary to being untrue, the record indicated that the detective believed the statement was true when spoken. By his statements later in the interview, defendant believed there could be charges following his escape; that is likely why he asked the question in the first place.

From the totality of the circumstances, the undersigned concludes that defendant knew his *Miranda* rights and his decisions to waive them and answer the detective's questions and to ask questions of his own were the products of his own choice unlimited by any substantial pain, fatigue, or ignorance.

*Defendant's waiver of his rights and his statements both were voluntary*

Defendant's implied waiver of rights and his oral statements to the detective were all constitutionally voluntary. None of them was the result of government overreaching, such as mental or physical coercion, deception, or intimidation. *Colorado v. Connelly*, 479 U.S. at 169-70; *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *United States v. Jordan*, 150

F.3d 895, 898 (8th Cir. 1998). Defendant never invoked his right to remain silent or to counsel. He even agreed to provide more information to the detective in the future if asked.

## CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the motions of defendant Kurt Wallace for a pretrial determination of the admissibility of co-conspirator statements **[Doc. 302]** and to exclude forensic evidence **[Doc. 303] are deferred** to the District Judge for determination in conjunction with the trial of this action.

**IT IS FURTHER ORDERED** that the motion of the government for a determination of the admissibility or not of any arguably suppressible evidence **[Doc. 208 oral] is denied** as mooted by the filing of this Order and Recommendation.

**IT IS HEREBY RECOMMENDED** that the motions of defendant Kurt Wallace to suppress cellular location data **[Doc. 305]**; to suppress photo lineup identification **[Doc. 306]**; to suppress statements **[Doc. 307]**; and generally to suppress arguably suppressible evidence **[Doc. 207 oral]** be denied.

The parties are advised they have 21 days from the issuance of this Order and Recommendation to file documentary objections thereto. The failure to timely file written objections may waive the right to appeal issues of fact.

                                               /s/ David D. Noce
                                       **UNITED STATES MAGISTRATE JUDGE**

Signed on April 6, 2023.